Szoka pending the completion of the FCC's administrative rulemaking process.

### III

For the foregoing reasons, the judgment of the district court is AFFIRMED.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0245P (6th Cir.)
File Name: 01a0245p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

No. 00-3274

JERRY SZOKA,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 99-02008—Kathleen McDonald O'Malley,
District Judge.

Argued: June 14, 2001

Decided and Filed: July 30, 2001

Before: BOGGS and SUHRHEINRICH, Circuit Judges;
and CLELAND, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Mark I. Wallach, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, for Appellant. Mark S. Davies, UNITED STATES DEPARTMENT OF JUSTICE,

_____

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

CIVIL DIVISION, APPELLATE SECTION, Washington, D.C., for Appellee. **ON BRIEF:** Mark I. Wallach, CALFEE, HALTER & GRISWOLD, Cleveland, Ohio, James M. Moody, KELLY & POVICH, Washington, D.C., for Appellant.   Susan Pacholski, Jacob M. Lewis, UNITED STATES DEPARTMENT OF JUSTICE, CIVIL DIVISION, APPELLATE SECTION, Washington, D.C., for Appellee.

———————————————

## OPINION

———————————————

BOGGS, Circuit Judge.  Defendant Jerry Szoka appeals the district court's decision permanently enjoining him from making unauthorized radio transmissions in violation of 47 U.S.C. § 301.  For the following reasons, we affirm.

I

In September 1995, Szoka, a licensed electrician and former technical adviser at a college radio station, began operating Grid Radio on an empty frequency, 96.9 FM, with a low-power output of 48.8 watts in Cleveland, Ohio.  The station was named for "The Grid," a Cleveland nightclub that Szoka partially owns.  While it was on the air, Grid Radio billed itself as a non-profit, community-oriented, all-volunteer broadcast station.  The station primarily played dance music, but also served the information and entertainment needs of the gay, lesbian, and arts communities of Cleveland.

Szoka did not apply for a broadcast license from the Federal Communications Commission (FCC) as required by the Communications Act of 1934 ("the Communications Act" or "the Act"), 47 U.S.C. § 301.  Szoka asserts that he did not apply for a license because of the FCC's ban on low-power

3

Szoka also argues that the district court was required to await the resolution of his appeal to the D.C. Circuit before ruling on the FCC's motion for an injunction.  There is no basis in law for this argument.  Cease and desist orders from the FCC are effective on the date of their release, which in this case was June 15, 1999, five days after the FCC adopted its decision affirming the ALJ's cease and desist order.  *See* 47 C.F.R. §§ 1.103(a), 1.4(b)(2).  At that point, the aggrieved party is directed to the D.C. Circuit to appeal the order pursuant to 47 U.S.C. § 402(b)(7), and the FCC is directed to the district court to seek enforcement pursuant to 47 U.S.C. § 401(b).  Szoka is unable to point to any provision of the Act that states that a cease and desist order is not effective upon its release or that a district court is prevented from enforcing such an order until appellate proceedings in the D.C. Circuit are concluded.  This is unsurprising because the existence of such a provision would prevent the FCC from enforcing its regulations and would enable a broadcaster against whom an order was entered to delay the enforcement of the order by dragging out the appeals process.  Moreover, pursuant to 47 U.S.C. § 402(c), Szoka had the opportunity to file a motion to expedite his appeal in the D.C. Circuit or a motion to stay the effectiveness of the cease and desist order pending appeal but there is no indication that Szoka did so.  *See supra* note 7.

In addition, Szoka contends that the district court should have awaited the resolution of the FCC's low-power FM radio administrative rulemaking proceedings.  This argument is also unfounded.  The FCC took action against Szoka because he was broadcasting without a license, not because he was operating what was, in effect, a low-power FM radio station.  There is no basis for staying the current proceedings against

———————————————

*Prayze FM*:  whether a broadcaster can raise constitutional arguments to the district court in defense against the government's motion for an injunction when an FCC cease and desist order has not previously been issued.

*Id.* at 1007 (citing *Sable Communications of Cal., Inc. v. FCC*, 827 F.2d 640, 642 (9th Cir. 1987)). As a result, the court concluded that the district court lacked jurisdiction over the broadcaster's constitutional arguments on the basis of 47 U.S.C. § 402(a) and 28 U.S.C. § 2342.

In *Prayze FM v. FCC*, 214 F.3d 245, 251-53 (2d Cir. 2000), the Second Circuit held that although a microbroadcaster lacked standing to bring an as-applied challenge to the FCC low-power radio regulations since the broadcaster had not applied for a license, the broadcaster could bring a facial challenge to the regulations.

Our reasoning differs from that of other circuit courts that have addressed whether an unlicensed microbroadcaster can raise constitutional defenses against the government's motion for an injunction. The difference is based on the fact that in this case the FCC is seeking an injunction to enforce a cease and desist order, rather than acting pursuant to its general enforcement powers under 47 U.S.C. § 401(a). We base our decision on the statutory language of the Communications Act, 47 U.S.C. § 402(b)(7), which directs that appeals of cease and desist orders be made to the D.C. Circuit, and 47 U.S.C. § 401(b), which allows the FCC to seek an injunction enforcing its cease and desist in district court. Reading these statutory provisions together, we do not believe that, when determining whether to issue an injunction, the district court can consider the constitutional arguments of an individual against whom an FCC cease and desist order has been issued.[13]

---

[13]Our holding is not meant to cast any doubt on this court's prior holding in *Strawcutter*. We have discussed in detail the difference between the circumstances of this case, in which a broadcaster cannot raise constitutional arguments in defense against the government's motion for an injunction enforcing a cease and desist order and those of *Strawcutter*, in which a broadcaster can raise constitutional arguments in defense against a civil in rem forfeiture action undertaken by the FCC.

Our holding is limited to the circumstances of this case. We reserve for another day the question faced by the courts in *Fried*, *Dunifer*, and

---

(or microradio) FM stations,[1] a ban that he claims violates the

---

[1]The FCC grants FM broadcast licenses under four separate classifications (A through D) depending upon factors such as transmission power, antenna height, and the area or place from which the broadcast is emanating. 47 C.F.R. § 73.210 *et seq.* Class D licenses are allocated to so-called "microbroadcast" low-power FM stations that operate at a power level of less than 100 watts and an approximate reception area of between two to twelve miles radius from the point of transmission. Under regulations in effect from 1978 until early 2000, the FCC forbade the issuance of all future Class D licenses, with certain limited exceptions. 47 C.F.R. §§ 73.211(a), 73.511(a), 73.512(c).

On January 27, 2000, the FCC adopted new rules regarding low-power broadcasting. *See Creation of Low Power Radio Service*, 15 FCC Rcd. 2205, 2000 WL 85304 (released Jan. 27, 2000). Pursuant to the new rules, two new classes of noncommercial educational FM radio stations are to be created, one at a maximum of 10 watts and one at a maximum of 100 watts. Individuals who continued to engage in unlicensed broadcasting after February 26, 1999, or who refused to stop unlicensed operations "within 24 hours of being advised by the Commission to do so" would be ineligible for a low-power license under the new rules. *See id.* at para. 54.

In legislation signed into law in late 2000, Congress mandated an even more stringent ban on the ability of past unlicensed broadcasters to obtain low-power FM licenses. In response to this legislative mandate, the FCC recently modified its rules to "prohibit any applicant from obtaining a low-power FM license if the applicant has engaged in any manner in the unlicensed operation of any station in violation of section 301 of the Communications Act of 1934." *Creation of a Low Power Radio Service*, FCC No. 01-100, 2001 WL 310997, at para. 10 (released Apr. 2, 2001).

Szoka had the opportunity to file an application for a low-power FM license during the FCC's filing window for applications from Ohio, which was in January 2001. *See Low Power FM Filing Window*, FCC No. 00-2831, 2000 WL 1843397 (Dec. 15, 2000). The list of applications released by the FCC indicates that the Szoka did not apply for a license during this filing window. *See Broadcast Applications*, FCC No. 24962, 2001 WL 367588 (Apr. 12, 2001). Even if Szoka had applied, the FCC's rule prohibiting past unlicensed broadcasters from obtaining a low-power FM license would effectively bar Szoka's application. *See* FCC No. 01-100, 2001 WL 310997, at para. 11 (stating that the FCC "will dismiss those applications now on file that responded 'No' to FCC Form 318 [the low-power FM license application form], Section III, Question 8(a),"

First Amendment and the Act.

Szoka describes Grid Radio as offering a valuable public service while not interfering with other broadcast outlets. He states that Grid Radio was serving a niche audience and demonstrating the need for and value of low-power FM radio stations.[2] Szoka provides the court with favorable comments from letters and e-mails sent to Grid Radio by numerous individuals in order to demonstrate the impact Grid Radio had on its listeners. Szoka also asserts that he chose an empty frequency, low-power output, and a relatively low antenna height in order not to cause harmful interference while providing his audience with a quality signal.

Grid Radio was on the air without commercial interruption seven days a week, from 4 p.m. to 3 a.m. Monday through Friday, with broadcasts beginning at 1 p.m. on weekends. In addition to broadcasting dance music that it claims is unavailable in the Cleveland market, Grid Radio broadcast a three-hour weekly program entitled "The Beat Boys," which provided news and interviews pertinent to the gay community, dealt with issues such as gay marriage and hate crimes, and promoted local artistic and entertainment events. Grid Radio also had a community bulletin board and made routine public service announcements regarding AIDS awareness and

which "requests applicants to certify that neither the applicant nor any party to the application engaged in any manner in the unlicensed operation of any station in violation of Section 301 of the Communications Act of 1934, as amended").

[2]Szoka describes himself as "part of a grass-roots movement of microradio 'pioneers' (called 'pirates' by the FCC and the National Association of Broadcasters)" who, through "'broadcast civil disobedience'" attempt to "demonstrate the need and viability of microradio, as well as the unlawfulness of the FCC's regulatory ban on small stations." Defendant-Appellant's Brief at 17 n.4 (citing Greg Ruggiero, *Microradio Broadcasting: Aguascalientes of the Airwaves*, Z MAGAZINE, at 25 (Dec. 1998) (quoting Noam Chomsky); Jim Cullen, *Pirate Radio Fights for Free Speech*, THE PROGRESSIVE POPULIST (April 1998)).

holding, and concluded that an unlicensed microbroadcaster could *not* raise constitutional defenses against a civil forfeiture action undertaken by the FCC.[11] The *Fried* court relied on statutory language indicating that the courts of appeals have exclusive jurisdiction to review all final orders of the FCC, including orders deciding applications for broadcast licenses and requests for waivers. 207 F.3d at 462-63. Specifically, the court relied on 47 U.S.C. § 402(a), which states that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the Commission . . . shall be brought as provided by and in the manner prescribed in chapter 158 of Title 28." The statute that § 402(a) cross-references states: "The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of--(1) all final orders of the Federal Communications Commission made reviewable by section 402(a) of title 47." 28 U.S.C. § 2342. The *Fried* court stated that the microbroadcaster could have "obtained review by applying for a license and asking for a waiver of the regulations; rejection of his request would have permitted appeal to the circuit. Rather than follow the procedures established by law, he has attempted an end run blocked by the statutory channels provided for constitutional claims." 207 F.3d at 463. The court in *Neset* concluded that *Fried*'s "rationale applies as well to actions seeking injunctive relief under 47 U.S.C. § 401(a)." 235 F.3d at 421.[12]

In *United States v. Dunifer*, 219 F.3d 1004, 1006-07 (9th Cir. 2000), the Ninth Circuit explicitly followed *Fried*. The court acknowledged that the broadcaster was not challenging an FCC order, but relied on previous circuit precedent indicating that "challenging FCC regulations is equivalent to an action to enjoin, annul, or set aside an order of the FCC."

[11]This decision runs contrary to this court's decision in *Strawcutter*.

[12]A member of the panel in *Neset* dissented, agreeing with this court's decision in *Strawcutter* and extending it to the district court's review of the FCC's motion for an injunction. *Neset*, 235 F.3d at 421 (Heaney, J., dissenting).

desist order. At the same time, the D.C. Circuit could have affirmed the cease and desist order, which held that the FCC's ban on microradio broadcasters was constitutional. Such a contradictory result is one that we wish to avoid. It is also a result that the Communications Act was designed to avoid, since the Act gives exclusive jurisdiction for review of FCC cease and desist orders to the D.C. Circuit. Only the D.C. Circuit can nullify a cease and desist order based on unconstitutional regulations promulgated by the FCC. Therefore, Szoka cannot raise his constitutional arguments as a defense against the government's motion for an injunction enforcing the cease and desist order. He can address his constitutional arguments only to the D.C. Circuit during its review of the cease and desist order.[9]

Other circuit courts have addressed whether an unlicensed broadcaster can raise constitutional defenses against the FCC's motion for an injunction, but in each of those cases the FCC was not seeking the injunction to enforce a cease and desist order under 47 U.S.C. § 401(b), but rather, relying on general enforcement powers under 47 U.S.C. § 401(a).[10]

In *United States v. Neset*, 235 F.3d 415 (8th Cir. 2000), the court applied the Eighth Circuit's previous holding in *United States v. Any and All Radio Station Transmission Equipment* ("*Fried*"), 207 F.3d 458 (8th Cir. 2000). In *Fried*, a panel of the Eighth Circuit, upon rehearing, reversed its previous

---

[9]Unlike the district court, we refuse to speculate on the constitutionality of the FCC regulations prohibiting the licensing of microradio stations that were in effect when Szoka began broadcasting Grid Radio.

[10]In full, 47 U.S.C. § 401(a) states:

The district courts of the United States shall have jurisdiction, upon application of the Attorney General of the United States at the request of the Commission, alleging a failure to comply with or a violation of any of the provisions of this chapter by any person, to issue a writ or writs of mandamus commanding such person to comply with the provisions of this chapter.

testing, safe sex, housing issues, and counseling services. Szoka describes the station as providing an effective "counterspeech" voice against hate speech and homophobic humor on other Cleveland radio stations.

On November 4, 1996, the Detroit Field Office of the FCC's Compliance and Information Bureau received a complaint from Mark Krieger of the Northeast Ohio Society of Broadcast Engineers regarding Grid Radio's unauthorized operation. On February 20, 1997, the office sent a letter warning Grid Radio that unlicensed broadcasting violated the Communications Act. The FCC warned Grid Radio that its operator could be subject to statutory sanctions and ordered that "[o]peration of radio transmitting equipment without proper authority granted by the Commission should cease immediately." On June 11, 1997, the FCC sent the station a second warning letter. Although Szoka admits that he received these letters, he did not stop broadcasting as Grid Radio.

On April 6, 1998, after confirming that the station was still on the air, the FCC released an Order to Show Cause why Szoka "should not be ordered to CEASE AND DESIST from violating Section 301 of the Act." *In re Jerry Szoka Cleveland, Ohio*, FCC No. 98-64, 1998 WL 153227, at para. 7 (Apr. 6, 1998). The FCC acted pursuant to its power under 47 U.S.C. § 312(b) to issue cease and desist orders as a means of enforcing the licensing requirement and other provisions of the Act. On September 4, 1998, an administrative law judge issued a summary decision finding that there were no genuine issues of material fact, since Szoka admitted operating a radio station and did not have a license to do so. *In re Jerry Szoka Cleveland, Ohio*, FCC No. 98D-3, 1998 WL 559385 (Sept. 4, 1998). The administrative law judge rejected Szoka's arguments that he was not required to obtain a license because the FCC regulations prohibiting the licensing of low-power radio stations violated the First Amendment and were inconsistent with the Commissioner's statutory mandate to regulate in the public interest. *Id.* at paras. 9-10.

The FCC affirmed the administrative law judge's decision on June 15, 1999. *In re Jerry Szoka Cleveland, Ohio*, FCC No. 99-145, 1999 WL 386918 (June 15, 1999). The Commission stated that "the Supreme Court repeatedly has affirmed that there is no First Amendment right to broadcast without a license and that the Commission has authority to regulate the radio spectrum." *Id.* at para. 12. Szoka filed a petition to reconsider with the FCC, which the Commission denied on October 19, 1999. *In re Jerry Szoka Cleveland, Ohio*, FCC No. 99-297, 1999 WL 867680 (Oct. 19, 1999)

On November 17, 1999, Szoka filed a notice of appeal of the FCC's cease and desist order in the United States Court of Appeals for the District of Columbia Circuit. Szoka directed his appeal to the D.C. Circuit as required by 47 U.S.C. § 402(b)(7). That litigation is still pending as Case Nos. 99-1463 and 99-1527 and is scheduled for oral argument in September 2001.

Even though the cease and desist order was entered against Szoka, Grid Radio remained on the air. In order to compel compliance with the cease and desist order, the United States filed suit in the United States District Court for the Northern District of Ohio pursuant to 47 U.S.C. § 401(b). The FCC requested a preliminary and permanent injunction to stop Szoka from continuing to broadcast without a license. After a combined preliminary injunction hearing and trial on the merits, the district court ruled in favor of the government and entered an injunction ordering Szoka to stop broadcasting by March 1, 2000.

The district court indicated that because Congress had provided a statutory basis for an injunction, the government need only show that the statutory requirements were met in order for an injunction to be issued. The district court stated that even if it were to engage in an equitable balancing of harms and to take into account the public interest, the factors would weigh in favor of the United States and would mandate the entry of the injunction. The court concluded that an injunction was necessary because, "[i]f radio stations could

the FCC's administrative proceedings against him and in his appeal of the results of those proceedings in the District of Columbia Circuit.

This result allows Szoka to raise his constitutional defenses within the scheme contemplated by the Communications Act. In *Strawcutter*, no FCC order was issued against the unlicensed microbroadcaster. Instead, the FCC went directly to the district court and instituted an in rem forfeiture action against the broadcaster. The broadcaster had no other forum in which to present his constitutional defenses. In this case, however, an FCC order was issued against Szoka, mandating that he cease and desist from broadcasting without a license. Szoka had the opportunity to raise his constitutional defenses in the course of the administrative action undertaken by the FCC. The FCC considered all of Szoka's constitutional defenses and rejected them. *See In re Jerry Szoka Cleveland, Ohio*, FCC No. 99-145, 1999 WL 386918, at paras. 16-19 (June 15, 1999). Szoka can raise his constitutional defenses once more in his appeal of the cease and desist order to the D.C. Circuit. There was no need for the district court to address Szoka's constitutional arguments, because he was able to raise them in other proceedings.

Moreover, allowing both the court reviewing the FCC's cease and desist order and the court considering whether to grant an injunction enforcing the cease and desist order to address a broadcaster's constitutional arguments could create contradictory holdings within the same case. The district court properly concluded that its proceedings were limited solely to the question of whether an injunction should issue against Szoka. In other words, it had no jurisdiction to set aside or suspend the FCC's cease and desist order, since review of the cease and desist order is reserved for the D.C. Circuit.

If the district court were to have considered Szoka's constitutional arguments, it could have concluded that the FCC's ban on microradio broadcasters was unconstitutional. This finding could have effectively nullified the cease and

The *La Voz* court stated that in *Strawcutter,* "this court held that when the FCC does not proceed administratively against an unlicensed microbroadcaster, but instead initiates an in rem action in the district court seeking the forfeiture of offending broadcasting equipment, the microbroadcaster is not precluded from challenging the legal basis of the government's forfeiture case in the district court." *Id.* at 319. The *La Voz* court emphasized the different circumstances that exist when a cease and desist order is issued against and challenged by a microbroadcaster. The court stated that, "[o]f critical importance in *Strawcutter* was the fact that no FCC order was being challenged," and that review of cease and desist orders "is committed to the District of Columbia Circuit." *Id*. at 320; *see also Rippe v. FCC*, 528 F.2d 771, 772 (6th Cir. 1976). The court stated that under *Strawcutter*, "a microbroadcaster may raise constitutional arguments as a shield to defend itself in a forfeiture action brought by the government when the forfeiture action was not preceded by any formal administrative action." *Ibid.*

While the circumstances of this case differ from those of *La Voz*, the controlling legal principles do not. *La Voz* emphasized that when challenging the constitutionality of the FCC's regulations against microbroadcasters, certain rules must be followed. When the FCC institutes an in rem forfeiture action--and not an administrative action--against a microbroadcaster, the broadcaster can raise and the district court can consider constitutional defenses. However, if the FCC institutes administrative proceedings, such as the issuance of a cease and desist order, against a microbroadcaster, the microbroadcaster must pursue his constitutional claims through the means given by Congress, which is the administrative process undertaken by the FCC and its review in the D.C. Circuit. Just as the plaintiff in *La Voz* could not use a constitutional claim as a sword to launch a preemptive strike against the FCC, so too is Szoka unable to use his constitutional claim as a shield in defense against the FCC's motion for an injunction enforcing the cease and desist order. That does not mean that Szoka's shield is taken away from him. It just means that he can use it only during

broadcast without a license so long as they claim to serve some segment of the public not currently being served by other radio stations, the structure set up by Congress in the Communications Act . . . to stop a 'cacophony of competing voices, none of which could be clearly and predictably heard,' without some control, would be impotent." The court stated that "even if Szoka is correct in his belief that the FCC's regulations . . . are unconstitutional, Szoka has no right to simply broadcast without a license."

The court nevertheless went on to opine on the FCC's regulations, stating in dicta that, "[b]ased on the limited record before it, the Court is inclined to agree that the FCC's non-commercial low-power broadcasting ban smacks of favoritism towards wealthier interest groups who do not wish to share the airwaves with non-commercial stations." It appeared to the court that the FCC's ban on low-power stations would run "contrary to the FCC's obligation to distribute the airwaves in a manner that furthers the 'public interest' and, thus, would be inconsistent with the First Amendment." The court concluded, however, that "this is not the correct forum to bring a direct challenge to the FCC's ban on low-power radio, making this Court's view of that ban irrelevant." The court noted that the D.C. Circuit is the proper forum for such claims, which Szoka can make in arguing that the cease and desist order should be lifted.

On February 29, 2000, the district court denied Szoka's motion to suspend the injunction. On March 1, 2000, Szoka filed a timely notice of appeal and an emergency motion to stay the injunction pending appeal. This court denied Szoka's emergency motion on March 10, 2000.

## II

### A

This court reviews the grant of a preliminary and permanent injunction to determine whether the district court abused its discretion. *See United States v. Any and All Radio Station Transmission Equipment*, 204 F.3d 658, 665 (6th Cir. 2000)

("*Strawcutter*"); *Waste Mgmt., Inc. of Tenn. v. Metro. Gov't of Nashville and Davidson County*, 130 F.3d 731, 735 (6th Cir. 1997). The district court abuses its discretion if it "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Waste Mgmt.*, 130 F.3d at 735; *see also Strawcutter*, 204 F.3d at 665. The district court's decision that it lacked the power to consider equitable defenses is reviewable de novo as a question of law. *See Rock & Roll Hall of Fame and Museum, Inc. v. Gentile Productions*, 134 F.3d 749, 754 (6th Cir. 1998).

B

Szoka believes he is fighting a noble battle in favor of microradio broadcasting in general and his community of listeners in particular. That may be the case, but it is not for this court to pass judgment on. This case concerns the sole question of whether the district court acted properly in issuing an injunction to prevent Szoka from broadcasting without a license. Our analysis must begin and end with that question, even though Szoka wishes it to go further.

At its core, this is a simple case. An individual cannot broadcast without a license. 47 U.S.C. § 301.[3] The FCC has the power to issue a cease and desist order against an individual who broadcasts without a license. 47 U.S.C.

---

[3]In pertinent part, 47 U.S.C. § 301 states:

No person shall use or operate any apparatus for the transmission of energy or communications or signals by radio (a) from one place in any State, Territory, or possession of the United States or in the District of Columbia to another place in the same State, Territory, possession, or District . . . except under and in accordance with this chapter and with a license in that behalf granted under the provisions of this chapter.

---

by the FCC pursuant to 47 U.S.C. § 510(a).[8] Szoka contends that *Strawcutter* applies equally to his case, which involves a different form of enforcement: a motion for an injunction seeking to enforce an administrative order. We are not persuaded. We believe that there are fundamental differences between the government undertaking a civil forfeiture action against an unlicensed broadcaster, as in *Strawcutter*, and the government securing a cease and desist order against an unlicensed broadcaster and then seeking injunctive relief from the district court to enforce that action, as in this case.

This court recently discussed this distinction in *La Voz Radio de la Communidad v. FCC*, 223 F.3d 313 (6th Cir. 2000). In *La Voz*, a microbroadcaster engaged in a preemptive strike against the FCC by seeking an injunction to prevent the FCC from taking any action to stop the microbroadcaster from broadcasting without a license. This court affirmed the district court's dismissal of the action for lack of subject matter jurisdiction. The plaintiff relied on a constitutional claim under the Religious Freedom Restoration Act as a basis for district court jurisdiction. *Id.* at 319. This court rejected the argument, ruling that the broadcaster could not raise a constitutional claim "as part of a preemptive action designed to stop the FCC from availing itself of its statutory remedies against unlicensed microbroadcasters." *Id.* at 320. The court noted that although the broadcaster could not raise its constitutional arguments as part of a preemptive attack against the FCC's regulations, it could raise them as part of "the method prescribed by Congress for the review of FCC actions." *Ibid.*

---

[8]In full, 47 U.S.C. § 510(a) states:

Any electronic, electromagnetic, radio frequency, or similar device, or component thereof, used, sent, carried, manufactured, assembled, possessed, offered for sale, sold, or advertised with willful and knowing intent to violate section 301 or 302a of this title, or rules prescribed by the Commission under such sections, may be seized and forfeited to the United States.

individuals who want to broadcast than there are frequencies to allocate, it is idle to posit an unabridgeable First Amendment right to broadcast comparable to the right of every individual to speak, write, or publish." *Id.* at 388.

In recent cases considering constitutional challenges raised in forfeiture proceedings instituted by the FCC against microradio broadcasters, this court noted these longstanding principles. *See United States v. Any and All Radio Station Transmission Equipment*, 218 F.3d 543, 549-50 (6th Cir. 2000) (stating that broadcaster "does not have a First Amendment right to broadcast his views on an unlicensed radio station"); *Strawcutter*, 204 F.3d at 666 (noting that there is no constitutional right to broadcast without a license and that "nobody has a First Amendment right to hear radio broadcasts from a station that does not have a First Amendment right to broadcast them").

b

Even though Szoka concedes that he has no constitutional right to broadcast without a license, he challenges the FCC's actions against him on the basis that the FCC's former ban on microradio broadcasters constituted a violation of the First Amendment. In effect, Szoka argues that the FCC's ban on microradio broadcasters made it futile for him to even attempt to obtain a license. The district court properly concluded that Szoka was unable to use his constitutional arguments as a defense against the FCC's motion for an injunction.

This case is the next step in a logical progression of caselaw developed by this court in recent years regarding the ability of low-power radio broadcasters to raise constitutional arguments as a defense against FCC enforcement actions. In *Strawcutter*, 204 F.3d at 668, this court held that a district court can consider an unlicensed microradio broadcaster's constitutional defenses to an in rem forfeiture action instituted

§ 312(b).[4]   Once the cease and desist order is entered, the individual must stop broadcasting. The individual is given the opportunity to appeal the cease and desist order, but the appeal must go to the United States Court of Appeals for the District of Columbia Circuit, which has exclusive jurisdiction over such matters. 47 U.S.C. § 402(b)(7).[5] If an individual does not obey a cease and desist order, the Act allows the FCC to seek enforcement in the appropriate federal district court. 47 U.S.C. § 401(b).[6]   According to § 401(b), the district court is to conduct a hearing and enforce the FCC's order if the court determines that "the order was regularly

---

[4]In pertinent part, 47 U.S.C. § 312(b) states:

Where any person . . . (2) has violated or failed to observe any of the provisions of this chapter . . . the Commission may order such person to cease and desist from such action.

[5]In full, 47 U.S.C. § 402(b)(7) states:

Appeals may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia in any of the following cases:

(7) By any person upon whom an order to cease and desist has been served under section 312 of this title.

[6]In full, 47 U.S.C. § 401(b) states:

If any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order. If, after hearing, that court determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of injunction or other proper process, mandatory or otherwise, to restrain such person or the officers, agents, or representatives of such person, from further disobedience of such order, or to enjoin upon it or them obedience to the same.

made and duly served" and that "the person is in disobedience of the same."

Szoka was broadcasting without a license. The FCC issued a cease and desist order against him. Szoka has appealed the cease and desist order to the D.C. Circuit. In the meantime, Szoka did not obey the cease and desist order and continued to broadcast. The FCC sought injunctive relief in federal district court. The district court determined that the "order was regularly made and duly served" and that Szoka disobeyed it. Therefore, the district court entered an injunction against Szoka. The district court acted properly. Szoka presents no credible evidence indicating that (1) he was not broadcasting without a license, (2) the cease and desist order was not regularly made and duly served, and (3) he was not disobeying the order. We agree with the district court's conclusion: "Szoka has no right to simply broadcast without a license." Therefore, we must affirm the district court's decision.

## C

Szoka raises a number of arguments that add a few wrinkles to what otherwise seems a straightforward case. Szoka claims that the district court erred by (1) not properly considering traditional equitable factors for issuance of an injunction, (2) not considering Szoka's constitutional arguments against the FCC's ban on microradio broadcasters, and (3) not staying enforcement of the FCC's cease and desist order until completion of Szoka's appeal of the cease and desist order to the D.C. Circuit and the FCC's ongoing administrative rulemaking process regarding low-power FM radio. We will address each of these arguments in turn.

### 1

Szoka contends that the district court erred in determining that it need not consider traditional equitable factors when entering injunctive relief in favor of the government. In most cases, a district court must consider four factors when determining whether to issue a preliminary injunction:

former ban on microradio broadcasters is unconstitutional because it violates the First Amendment. As a result, he claims that the FCC cannot seek an injunction enforcing its cease and desist order.

#### a

We note as an initial matter that Szoka's constitutional arguments against the FCC's actions are limited to his challenge of the FCC's former ban on microradio broadcasters. Szoka does not contend that he has a constitutional right to broadcast without a license. In this case, Szoka did not apply for a license and fail because he was a microradio broadcaster or for some other reason. Nor did he seek review of the FCC regulations. Instead, he simply started broadcasting without a license as a form of civil disobedience against regulations he found objectionable. The FCC took action against Szoka not because he was broadcasting as a microradio station or because he objected to the FCC regulations, but because he was broadcasting without a license. There is no constitutional barrier to the FCC's ability to take action to enforce its licensing procedures.

The Supreme Court and this court have repeatedly held that there is no constitutional right to broadcast without a license. This principle dates back to the landmark Supreme Court decision *National Broadcasting Company v. United States*, 319 U.S. 190 (1943). In *National Broadcasting*, the Supreme Court upheld the constitutionality of the Communications Act and its licensing procedures as valid exercises of congressional power and held that "the right of free speech does not include, however, the right to use the facilities of radio without a license." *Id.* at 227. These holdings were reaffirmed in *Red Lion Broadcasting Company v. FCC*, 395 U.S. 367 (1969). In *Red Lion*, the Supreme Court stated that the Communications Act was necessary to prevent a "cacophony of competing voices, none of which could be clearly and predictably heard." *Id.* at 376. The Court declared that there was no constitutional right to broadcast on the airwaves, stating "[w]here there are substantially more

the cease and desist order (and presumably any injunction issued by a district court enforcing a cease and desist order) while the broadcaster's appeal is pending.

Szoka also contends that even if the district court could only consider if "the order was regularly made and duly served" and "the person is in disobedience of the same," the district court erred in doing so. Szoka relies on *CSX* to support his argument. In *CSX*, the congressionally mandated standard was "reasonable cause to believe" a statutory violation was occurring. This court observed that the standard "certainly cannot be met . . . by simply showing the possibility of a [statutory] violation." 964 F.2d at 555. Instead, the court held that "[t]he district court must make a preliminary determination, based on the evidence that has been submitted by the plaintiff and the responses made at that point, whether there is reasonable cause to believe that the Act has been violated." *Ibid.* Similarly, Szoka argues that the FCC cannot obtain an injunction simply by showing the possibility that Szoka violated the Communications Act.

This argument lacks credibility. The test in *CSX* was a different, looser one than in this case and required a somewhat more substantial showing from the party attempting to obtain the injunction. In this case, the FCC needed only to show that "the order was regularly made and duly served" and that "the person is in disobedience of the same." The FCC did so by demonstrating that the cease and desist order was validly entered and served and that Szoka continued to broadcast in the face of it. By making this showing, the FCC properly obtained an injunction pursuant to 47 U.S.C. § 401(b), which states that once this showing is made, "the court shall enforce obedience to such order by a writ of injunction."

2

Szoka also claims that the district court erred when it refused to consider Szoka's constitutional defenses to the government's motion for an injunction. Szoka argued to the district court and continues to argue on appeal that the FCC's

(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *See Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross and Blue Shield Ass'n*, 110 F.3d 318, 322 (6th Cir. 1997). In most cases in which a district court considers whether to issue a permanent injunction, the court must also consider whether the plaintiff has demonstrated (1) a continuing irreparable injury if the court fails to issue the injunction, and (2) the lack of an adequate remedy at law. *See Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998). The district court in this case determined that it was not required to consider these equitable factors, because Congress provided by statute the bases for the injunctive relief sought by the government. The court briefly stated that if it were required to consider traditional equitable factors, it still would be compelled to issue the injunction in favor of the government.

The district court did not err. According to 47 U.S.C. § 401(b), the government needed only to meet the statutory requirements for the issuance of an injunction enforcing the cease and desist order. In this sense, Congress has replaced the traditional equitable factors with a different inquiry. *See CSX Transp., Inc. v. Tennessee State Bd. of Equalization*, 964 F.2d 548, 551 (6th Cir. 1992) (holding that where Congress expressly authorized granting of injunctive relief to halt discriminatory state taxation of railroads by showing of "reasonable cause" of a statutory violation, traditional equitable criteria do not govern the issuance of a preliminary injunction); *Illinois Bell Tel. Co. v. Illinois Commerce Comm'n*, 740 F.2d 566, 571 (7th Cir. 1984) (court need not address traditional equitable factors such as irreparable harm when reviewing motion for injunction under § 401(b), since court "only need find that 'the order was regularly made and duly served'" and that defendant "is in disobedience of the same"). It was not necessary for the district court, nor is it

necessary for this court to consider traditional equitable factors.

Szoka relies on a number of inapposite cases in claiming that the district court was required to consider traditional equitable factors. The primary case upon which Szoka relies, *Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982), concerned an action brought pursuant to the Federal Water Pollution Control Act (FWPCA) seeking to enjoin the United States Navy from discharging ordnance into the waters surrounding Vieques Island in Puerto Rico without first obtaining a permit from the Environmental Protection Agency. The Supreme Court reversed the First Circuit's decision mandating that the Navy cease the discharges until it obtained a permit. The lower court ruled that the Navy had a statutory obligation to stop the discharges until the permit procedures had been followed. *Id.* at 311. The Supreme Court held that the appellate court erred by not considering traditional equitable factors. *Id.* at 320. In *Weinberger*, the Court specifically noted that Congress did not foreclose the exercise of equitable discretion in enacting the FWPCA. *Ibid.* The court indicated that Congress did not require a district court to issue an injunction for "any and all statutory violations" under the FWPCA but only when the court considers the relief "necessary to secure prompt compliance with the Act." *Ibid.*

That is simply not the case here. Szoka is unable to point this court to any portion of the Communications Act indicating that Congress intended to give courts the ability to exercise discretion in considering whether to issue injunctions pursuant to 47 U.S.C. § 401(b). The language of the statute indicates that Congress intended that the district court issue injunctive relief in favor of the government for any violations of the Communications Act in which a broadcaster continues to disobey a regularly made and duly served cease and desist order. By stating in 47 U.S.C. § 401(b) that if a district court "determines that the order was regularly made and duly served, and that the person is in disobedience of the same, the court shall enforce obedience to such order by a writ of

injunction," Congress used language that effectively limits the discretion of the district court.

The limited discretion given to a district court reviewing the government's motion for an injunction against a broadcaster that disobeys a cease and desist order is balanced by the broader discretion given to the District of Columbia Circuit in reviewing a request by the broadcaster for temporary relief from the cease and desist order. Upon the release of a cease and desist order, the aggrieved party may appeal to the District of Columbia Circuit, as Szoka did in this case. According to 47 U.S.C. § 402(c), "[u]pon filing of such notice, the [District of Columbia Circuit] shall have jurisdiction of the proceedings and of the questions determined therein and shall have power, by order, directed to the Commission or any other party to the appeal, to grant such temporary relief as it may deem just and proper." This statutory language gives the D.C. Circuit power to issue a stay of the cease and desist order and presumably gives the D.C. Circuit the ability to consider equitable factors, given the statute's language that the court may grant relief that it "deem[s] just and proper." *Ibid.*[7]

Under the scheme envisioned by the Act, the district court's powers and the D.C. Circuit's powers are complementary rather than contradictory. While the district court reviewing the government's motion for an injunction to enforce the cease and desist order must enter the injunction so long as the cease and desist order was regularly made and duly served and the broadcaster continues to disobey it, the D.C. Circuit has the ability to give the broadcaster temporary relief from

---

[7] In his Notice of Appeal and Petition for Review to the D.C. Circuit, Szoka raised the issue "[w]hether the cease and desist order should be stayed until the Commissioner grants Grid Radio a license, either by waiving existing rules or as part of a new low-power FM service . . . ." Szoka asserted this issue as one of his bases for appeal, not as a request for temporary relief from the D.C. Circuit pursuant to 47 U.S.C. § 402(c). There is no indication that Szoka formally requested the D.C. Circuit to stay the cease and desist order pending his appeal.